UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

MARVIN J. DAVIS,

          Petitioner,

             v.                               CAUSE NO. 1:23-CV-4-HAB-SLC

WARDEN,

          Respondent.

## OPINION AND ORDER

Marvin J. Davis, a prisoner without a lawyer, a prisoner without a lawyer, filed a habeas corpus petition under 28 U.S.C. § 2254 to challenge his conviction for rape and sexual battery under Case No. 02D05-1809-F3-57. Following a jury trial, on September 27, 2019, the Allen Superior Court sentenced him to fifteen years of incarceration.

## FACTUAL BACKGROUND

In deciding this habeas petition, the court must presume the facts set forth by the state courts are correct unless they are rebutted with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Indiana Court of Appeals summarized the evidence presented at trial:

> On July 17, 2018, Davis's friend Camille was with her daughter, P.H., when they made a stop at Davis's home. When Davis met Camille's daughter he said, "Wow, how old are you?" She replied, "Sixteen." Davis asked if she had any hobbies and then quickly followed with an offer to help her get a coaching position on the cheerleading team at the middle school.
>
> Because P.H. was interested, the next day Davis decided to drive her to Metro field to meet with the woman involved in the cheerleading

program. On their way to Metro field, Davis told P.H. that he had to stop
at his house to get some papers he had forgotten. When they arrived at
Davis's home he invited P.H. inside for a glass of water. As they entered,
Davis asked P.H. if she had ever been with an older man, telling her that
he could show her how. Davis then closed the door and pushed P.H.
against it. Davis used his right arm to hold her neck against the door and
his other hand to pull down P.H.'s pants and proceeded to rape her.
P.H. continuously asked Davis to stop and attempted to fight him off, but
Davis told her to shut up and put his hand over her mouth. When Davis
finished raping P.H., he dropped her off at her friend's house. Later it was
also determined that the cheerleading program that Davis offered P.H. did
not exist.

On August 29, 2019, a judgment of conviction was entered after a jury
found Davis guilty on Count I Level 3 felony rape and Count II Level 6
felony sexual battery. At the sentencing hearing, Davis was sentenced to
fifteen years on Count I and two years on Count II with both sentences
running concurrently.

*Davis v. State*, 147 N.E.3d 1046 (Ind. Ct. App. 2020); ECF 11-5 at 2-3.

In the petition, Davis asserts that he was entitled to habeas relief because the trial

court erred in admitted a video recording of the victim's interview and the prosecution

made an improper reference during closing argument. He asserts that trial counsel

erred by failing to object to the video recording and the improper closing argument and

by failing to impeach the victim with prior inconsistent statements.

Davis further asserts that he was improperly denied copies of the victim's

criminal history on post-conviction review. Because there is no constitutional right to

post-conviction proceedings, this claim does not present valid grounds for habeas relief.

*See Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987). In the traverse, Davis appears to

refashion this claim as the prosecution's failure to disclose material evidence before trial

and as trial counsel's failure to investigate. Raising additional grounds in this manner

was improper. *See* Rule 2(c)(1) of the Rules Governing Section 2254 Cases ("The petition

must specify all the grounds for relief available to the petitioner."); *Jackson v. Duckworth*,

112 F.3d 878, 880 (7th Cir. 1997) ("[A] traverse is not the proper pleading to raise

additional grounds."). Additionally, he did not present them to the State appellate

courts, so the court would dismiss them as procedurally defaulted.[1]

## PROCEDURAL DEFAULT

Before considering the merits of a habeas petition, the court must ensure that the

petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A);

*Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004). To avoid procedural default, a

habeas petitioner must fully and fairly present his federal claims to the state courts.

*Boyko v. Parke*, 259 F.3d 781, 788 (7th Cir. 2001). Fair presentment "does not require a

hypertechnical congruence between the claims made in the federal and state courts; it

merely requires that the factual and legal substance remain the same." *Anderson v.

Brevik*, 471 F.3d 811, 814–15 (7th Cir. 2006) (citing *Boyko*, 259 F.3d at 788). It does,

however, require "the petitioner to assert his federal claim through one complete round

of state-court review, either on direct appeal of his conviction or in post-conviction

proceedings." *Lewis*, 390 F.3d at 1025 (internal quotations and citations omitted). "This

---

[1] Davis argues that the prosecution's failure to disclose the victim's criminal history excuses procedural default, but he notes that he obtained the history during the pendency of his State post-conviction petition. Consequently, the failure to disclose did not prevent him from presenting these claims to the State courts and does not excuse procedural default. He further argues that lack of post-conviction counsel excuses procedural default pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). However, the *Martinez* exception serves to excuse procedural default only for ineffective assistance of trial counsel at the initial level of review, and Davis presented the failure to investigate claim to the Allen Superior Court. ECF 9-9 at 27, 177, 222, 226-27. Therefore, lack of post-conviction counsel also does not excuse procedural default.

means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Id.* "A habeas petitioner who has exhausted his state court remedies without properly asserting his federal claim at each level of state court review has procedurally defaulted that claim." *Id.*

On post-conviction review, Davis presented to the Indiana Supreme Court his claims that trial counsel erred by failing to object to the video recording and the improper closing argument and by failing to impeach the victim with prior inconsistent statements.[2] ECF 11-13. However, Davis did not present to the Indiana Court of Appeals or the Indiana Supreme Court his claims that the trial court erred in admitted a video recording of the victim's interview and that the prosecution made an improper reference during closing argument. ECF 11-3; ECF 11-8; ECF 11-13. Therefore, these claims are procedurally defaulted.

Davis argues that the court should excuse the procedurally defaulted nature of his claims based on actual innocence. A habeas petitioner can overcome a procedural default by establishing that the court's refusal to consider a defaulted claim would result in a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006). To meet this exception, the petitioner must establish that "a constitutional violation has resulted in the conviction of one who is actually innocent of the crime." *Schlup v. Delo*,

---

[2] On post-conviction review, Davis argued that trial counsel should have presented the victim's prior inconsistent statements through the doctrine of completeness. Though he frames the claim as a failure to impeach the victim on habeas review, the court finds that it is a substantially similar claim and will consider it fairly presented.

513 U.S. 298, 324 (1995). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 536–37 (2006). In this context, the court may consider evidence only if it is reliable and was not presented at trial. *Gladney v. Pollard*, 799 F.3d 889, 898 (7th Cir. 2015).

As new evidence, he offers the probable cause affidavit and the victim's deposition. ECF 12-9 at 126-27, 151-66. At trial, the victim testified that Davis forced her to engage in sexual intercourse at the front door of Davis' apartment. ECF 12-5 at 152-54. By contrast, the probable cause affidavit detailed the victim's police interview, hospital interview, and forensic interview in which she described forced sexual intercourse at the front door and in the bedroom. ECF 12-9 at 126-27. Significantly, trial counsel presented the victim's prior statements regarding the bedroom incident through cross-examination of the victim and the police officer who interviewed the victim. ECF 12-5 at 161-63; ECF 12-6 at 18-19. The prosecution also presented a video recording of the forensic interview in which the victim detailed the bedroom incident. ECF 12-6 at 67-73. Consequently the court cannot find that the admission of the probable cause affidavit would have affected the jury's evaluation of the evidence.

Next, Davis maintains that, at the victim's deposition, she denied knowledge about whether Davis used a condom, which contradicted her trial testimony. To the contrary, at her deposition, the victim testified that:

**Trial Counsel:** Do you know if he ejaculated? Do you know what I mean by that?

**Victim:** Yes. And I honestly don't know. I don't even know when he put on the condom to be honest with you.

**Trial Counsel:** I wasn't aware of that. So there was a condom?

**Victim:** Yes, sir.

**Trial Counsel:** How do you know?

**Victim:** After he was finished with all of it, he let me go, and he went to put his clothes back on.

\* \* \*

**Victim:** I excused myself. I just took it upon myself and the bathroom was right there by the door so I went into the bathroom. The door was still open. He could see into the bathroom from where he was standing. I picked up my phone when he was done, and I felt something dripping down my leg, and that's when I looked down, and I saw a condom, but he wasn't paying attention so I took tissue, and I wrapped the condom up.

ECF 12-9 at 160-61. This testimony substantially resembles the victim's testimony at trial. ECF 12-5 at 153-55. Consequently, the court cannot find that the admission of the victim's deposition testimony would have affected the jury's evaluation of the evidence.

Davis also argues that the court should excuse his procedurally defaulted claims because he did not have counsel at the post-conviction stage based on the exception established in *Martinez v. Ryan*, 566 U.S. 1, 9 (2012), which held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." However, none of Davis' procedurally defaulted claims are ineffective assistance of trial counsel

claims. Therefore, the *Martinez* exception does not excuse the procedurally defaulted nature of these claims.

In sum, Davis has not demonstrated that actual innocence or lack of post-conviction counsel excuses his procedurally defaulted claims. Nevertheless, the procedurally defaulted claims are closely related to the fairly presented ineffective assistance of trial counsel claims. During the course of considering the ineffective assistance of trial counsel claims, the court will also consider the procedurally defaulted claims on the merits.[3]

## LEGAL STANDARDS

### Habeas Review

"Federal habeas review . . . exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (quotations and citation omitted).

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

---

[3] Notably, federal courts have the discretion to consider claims for habeas relief under certain circumstances even if such claims are procedurally barred. 28 U.S.C. § 2254(b)(2).

> [This] standard is intentionally difficult to meet. We have explained that
> clearly established Federal law for purposes of §2254(d)(1) includes only
> the holdings, as opposed to the dicta, of this Court's decisions. And an
> unreasonable application of those holdings must be objectively
> unreasonable, not merely wrong; even clear error will not suffice. To
> satisfy this high bar, a habeas petitioner is required to show that the state
> court's ruling on the claim being presented in federal court was so lacking
> in justification that there was an error well understood and
> comprehended in existing law beyond any possibility for fairminded
> disagreement.

*Woods,* 135 S. Ct. at 1376 (quotation marks and citations omitted). Criminal defendants

are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To

warrant relief, a state court's decision must be more than incorrect or erroneous; it must

be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "A state court's

determination that a claim lacks merit precludes federal habeas relief so long as

fairminded jurists could disagree on the correctness of the state court's decision."

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

<u>Ineffective Assistance of Counsel</u>

To prevail on an ineffective assistance of counsel claim in the State courts, a

petitioner must show that counsel's performance was deficient and that the deficient

performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). There is "a

strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the defendant must overcome the presumption that,

under the circumstances, the challenged action might be considered sound trial

strategy." *Id.* at 689. "[S]trategic choices made after thorough investigation of law and

facts relevant to plausible options are virtually unchallengeable; and strategic choices

made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

The test for prejudice is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* at 693. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*." *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.*

DISCUSSION

Video Recording of the Forensic Interview

Davis asserts that he was entitled to habeas relief because the trial court erred in admitting a video recording of the victim's interview and further asserts that trial counsel erred by failing to object to the video recording. "To be of constitutional import, an erroneous evidentiary ruling must be so prejudicial that it compromises the petitioner's due process right to a fundamentally fair trial." *Howard v. O'Sullivan*, 185 F.3d 721, 723–24 (7th Cir. 1999). "This means that the error must have produced a significant likelihood that an innocent person has been convicted." *Id.* at 724. "Indeed,

because of this high standard, evidentiary questions are generally not subject to review in habeas corpus proceedings." *Id.*

At trial, Davis faced charges of rape and sexual battery. ECF 12-5 at 135-37. Under Indiana law, the criminal offense of rape is knowingly or intentionally engaging in sexual intercourse with another person when the other person is compelled by force or the imminent threat of force. Ind. Code § 35-42-4-1(a)(1). The criminal offense of sexual battery is intentionally arousing or satisfying one's sexual desires or the sexual desires of the other person by touching another person when that person is compelled to submit to the touching by force or the imminent threat of force. Ind. Code § 35-42-4-8(a)(1)(A).

The victim testified that, on July 18, 2018, her mother introduced her to her little brother's football coach, Davis. ECF 12-5 at 147-60. He offered to assist her with obtaining a job coaching junior cheerleaders and agreed to pick her up the next morning to see an individual named "Pumpkin" at the "Metro field". *Id.* The following morning, he picked her up. *Id.* He repeatedly commented on her age and appearance and also asked her about the ages of her romantic interests. *Id.* He told her that he needed to return to his apartment to pick up some documents. *Id.* He drove to his apartment, asked her to come into his apartment for water, and reassured her by telling her that his children were there. *Id.* She texted a friend that she felt uncomfortable as she climbed the stairs to his apartment. *Id.*

When she entered Davis' apartment, he closed the front door and pushed her against it. *Id.* He used his right arm to hold her neck as he used his left arm to remove

her pants. *Id.* He then penetrated her vagina with his penis. She tried to fight him off but gave up due to his physical stature. *Id.* He also covered her mouth and told her to shut up when she asked him to stop. *Id.* Once he finished, she went to his bathroom and found a used condom inside of her. *Id.* She wrapped it up and tucked it away. *Id.*

Thereafter, Davis dropped her off near a friend's house. *Id.* She had texted her friends, Nyla Dubose and Donovan Thompson. *Id.* Thompson met her and took her to his house, where he provided her with a change of clothes and allowed her to shower. *Id.* When she finished showering, her father and another friend, Jameslynn Wimes, had arrived. *Id.* Her father took her home, and she told her mother what happened. Her mother called the police and submitted a police report. *Id.* Her mother also took her and Wimes to a hospital. *Id.* Her injuries included neck pain, vaginal pain, and vaginal bleeding. *Id.* At the hospital, she recounted her story to a physician's assistant. *Id.* She then went to a child advocacy center and told a sexual assault nurse examiner what happened. *Id.*

Wimes testified that the victim had texted her that she was uncomfortable and then later texted her again to let her know that she was at the Thompson residence and that she had been raped. ECF 12-5 at 173-78. She testified that, when she saw the victim there, she was quiet and appeared as though she had been crying. *Id.* She confirmed the victim's account regarding her movements from the Thompson residence, to her home, the hospital, and the sexual assault treatment center. *Id.* Dubose testified that she texted and Facetimed with the victim after the rape and that she appeared shaky, sad, and as if she had been crying. *Id.* at 179-86. According to Dubose, the victim was usually bright,

happy, and smiling. *Id.* She called Thompson to retrieve the victim. *Id.* Thompson

testified that, after Dubose told him to retrieve the victim, he encountered her walking

on the street. *Id.* at 187-91. The victim cried, fell down, told him what happened, and

showed him the used condom. *Id.* He agreed to let her shower. The victim called her

mother, and other people came to his house to pick her up. *Id.*

    The victim's mother testified that the victim arrived back at home. ECF 12-5 at

192-204. The victim was quiet and pale as if she had seen a ghost. *Id.* The victim told her

what happened and showed her a plastic bag with the used condom and bloody

clothes. *Id.* She drove the victim to the hospital, which was near the sexual assault

treatment center and the child advocacy center, and she met with the police. *Id.* The

victim's mother noticed a mark on the victim's neck as if someone had pressed on it. *Id.*

    Lisa Bobay-Somers, physician assistant, testified that, at the hospital, the victim

appeared to be extremely upset and quietly crying. ECF 12-5 at 210- 25. The victim

complained of pain in the neck and of pain and blood in the vaginal area. *Id.* Bobay-

Somers observed two bluish bruises and petechial hemorrhages on the right side of her

neck that appeared to be a pressure injury consistent with the victim's account of Davis

applying pressure to her neck. *Id.* She conducted a pelvic examination and observed

significant irritation and bleeding consistent with trauma. *Id.* Following the

examination, she understood that the victim would go directly to the sexual assault

treatment center. *Id.* On cross-examination, Bobay-Somers testified that petechial

hemorrhages could be caused by sucking or grabbing but that sucking would not cause

bluish discoloration. *Id.* at 225-32.

Kaleb Eash, a police officer, testified that he met the victim at the hospital and characterized the victim as having a "1000-yard stare." ECF 12-6 at 12-18. He observed that she cried and seemed nervous as she spoke with him. *Id.* When he asked her if he could take her to the sexual assault treatment center, she seemed uncomfortable and asked if Wimer could come with her, and he obliged. *Id.*

Shawn Callahan, sexual assault nurse examiner, testified that she conducted a forensic exam on the victim at the sexual assault treatment center. ECF 12-6 at 20-46. She quoted the victim as telling her:

> He asked me how old I am. I went upstairs to get water. He said his kids were there. He grabbed me by the neck by the back. He asked, "Have you ever fucked an older man? Let me show you what an older man can do." He put his penis in my vagina. I was standing up being pushed against the front door. He was kissing my neck. Later he took me by the arms to the bedroom on the bed. I was on my back. He put his penis in my vagina again, now with a condom. I asked him to stop. He told me to shut up, then he ignored me. He said, "You can't tell anybody about this, what we just did. When can I see you again?" I went to the bathroom afterwards and, when I was wiping, I felt the condom inside me. I took it out and wrapped it in tissue and took it with me."

*Id.* She described the victim as soft-spoken, quiet, avoiding eye contact, clear, and articulate. *Id.* The victim complained of vaginal pain. *Id.* Nurse Callahan found injuries consistent with the victim's report of Davis grabbing her by the neck. *Id.* She photographed the bruises on the right side of the neck, and the trial court admitted these photographs into evidence. *Id.*

Lorrie Freiburger, a forensic interviewer, testified that she interviewed the victim at the child advocacy center. ECF 12-6 at 58-83. Without objection, the trial court admitted a video recording of the interview into evidence as State's Exhibit 7. *Id.* This

13

court has reviewed the video recording with a running time of sixty-five minutes in its entirety. The victim's account was substantially similar to the other accounts she provided in the immediate aftermath of the incident in that it described sexual intercourse occurring at the front door and in the bedroom.

James Winters testified that he was the president of Metro Youth Sports, which operates local youth programs for football, basketball, baseball, and cheerleading. ECF 12-6 at 84-87. He employed Davis as a football coach. *Id.* As of July 2018, Davis had not obtained certification to coach football for the 2018 season. *Id.* Thomas Macon testified that he was the financial officer and a football coach with Metro Youth Sports. *Id.* at 93-102. Cheerleading coaches must be at least twenty-one years of age, though, on one occasion more than a decade before the trial, an exception was made to allow a thirteen-year old to coach younger cheerleaders. *Id.* According to Macon, an individual who had not obtained proper certification to coach was not allowed to be around children participating in a sports program. *Id.* Zonitra Brookshire testified that she worked at Metro Youth Sports as a cheerleading coach and that her nickname was "Pumpkin." *Id.* at 110-15. She did not have the authority to hire cheerleading coaches. *Id.* In July 2018, Davis did not discuss hiring a cheerleading coach with her or try to set up a meeting with her and the victim. *Id.* He had asked her about hiring requirements on a prior occasion, and she directed him to the cheerleading commissioner. *Id.*

For the defense, Davis testified that he had offered to connect the victim with "Pumpkin" but that later that day another coach had told him that the victim was not old enough to coach. ECF 12-6 at 159-201. He did not have a good telephone number to

14

reach the victim or her mother, so he drove to their house to inform the victim in person. *Id.* He explained that she could not coach and told her that he intended to go home to "chill out" before running errands. *Id.* He drove with her to his apartment and invited her to come in because he planned to stay there for a while. *Id.* He provided her with water and began conversing with the victim on the couch. *Id.* After fifteen minutes, she complained of back and shoulder pain, so he rubbed her shoulders and back. *Id.* She enjoyed it and moved to his bed so that she could lie down. *Id.* She also removed her regular bra, sports bra, and shirt. *Id.* He applied baby oil to his hands and massaged her back. *Id.* She turned over, and he massaged her breasts and sucked on her neck. *Id.* She consented to the removal of her pants, and they performed oral sex on each other. *Id.* He put on a condom, and they engaged in sexual intercourse with the victim on top. *Id.* The victim did not physically resist or ask him to stop but instead encouraged him to continue when he sought her consent. *Id.* She went into the bathroom and clothed herself. *Id.* She asked him to take her home because a friend needed her assistance. *Id.*

As detailed above, Davis did not object to the admission of the video-recorded interview at trial and did not raise the issue on direct appeal. At the post-conviction stage, he asserted that trial counsel was ineffective for failing to object to the admission of the video-recorded interview because the video-recorded interview amounted to inadmissible hearsay. ECF 11-8 at 23-25. He further asserted that, to the extent that trial counsel allowed the admission for purposes of impeachment, trial counsel should have requested a supplemental instruction instructing the jury to consider the video-

15

recorded interview only for purposes of impeachment. *Id.* Trial counsel submitted an

affidavit, attesting that:

> While preparing for trial, I discussed the CAC video interview of the
> alleged victim in that case with Mr. Davis. My recollection is that Mr.
> Davis and I agreed that we wanted the video to be played at trial because,
> in the video, the alleged victim made statements that were inconsistent
> with her later statements. As it turned out, the victim did make statements
> at trial that were inconsistent with those in the video. Specifically, in the
> video, the alleged victim had stated that Mr. Davis raped her on his bed
> after raping her at his front door, but, at trial, she said she did not
> remember the incident on the bed, and, in fact, denied that it had
> occurred. I endeavored to impeach the victim's testimony at trial by
> means of her prior inconsistent statements in the video.

ECF 12-9 at 167-68.

The Indiana Court of Appeals rejected the ineffective assistance claim, reasoning

that trial counsel strategically decided to allow the admission of the video-recorded

interview for purposes of impeachment and so did not perform deficiently by declining

to object to its admission on hearsay grounds. ECF 11-11 at 8-10. The appellate court

further reasoned that Davis may have been entitled to a supplemental instruction but

found no prejudice based on the strength of the other evidence presented by the

prosecution. *Id.*

After reviewing the record, the court cannot find that the State court made an

unreasonable determination on the claim that trial counsel erred by failing to object to

the video recording. Trial counsel's affidavit demonstrates the strategic nature of the

decision. Given that Davis conceded sexually interacting with the victim, the primary

dispute at trial was whether Davis compelled the sexual interaction by force, which

largely turned on the credibility of the victim and of Davis. Under Indiana law, "[a]

16

prior inconsistent statement may be used to impeach a witness." *Townsend v. State*, 33

N.E.3d 367, 370 (Ind. Ct. App. 2015). The record demonstrates that the victim's account

in the immediate aftermath of the incident differed from her trial testimony with respect

to whether sexual activity occurred on the bed as noted by trial counsel. Relying on

prior inconsistent statements to impeach the victim was thus a reasonable strategy

supported by both evidence and applicable law.

The court also cannot find that the State court unreasonably determined that

Davis did not suffer prejudice due to the lack of a supplemental instruction. As

mentioned above, the primary factual dispute at trial was whether Davis used force to

compel sexual intercourse with the victim. The victim testified that Davis used physical

force and that she did not consent. Her testimony indicated that she acted in a manner

consistent with a rape victim. She testified that she went to the apartment based on

Davis' false representations, that she texted a friend that she felt uncomfortable prior to

entering the apartment, that Davis applied force to her neck, that she immediately

contacted friends to pick her up, that she immediately reported the incident to her

parents and police, and that she immediately sought medical care and forensic services.

Substantial evidence corroborated the victim's testimony regarding the issue of

force. The victim's mother and Wimes confirmed that the understanding that Davis

would pick her up for the sole purpose of helping her to obtain a cheerleading job,

while the Metro Youth employees testified that the victim was ineligible for the job and

that Davis never contacted them on behalf of the victim. Wimes confirmed that the

victim texted that she was uncomfortable. The victim's mother, Dubose, and Thompson

testified that the victim seemed uncharacteristically distraught immediately after the incident. Physician Assistant Bobay-Summers, Officer Eash, and Nurse Callahan, though less familiar with the victim, also confirmed that the victim appeared distraught. Physician Assistant Bobay-Summers and Nurse Callahan testified that they found the victim's neck bruises and vaginal bleeding consistent with the victim's account of the rape. Nurse Callahan also relayed what the victim told her about the incident at the sexual assault examination.

Considering the compelling evidence against Davis, it was not unreasonable to conclude that a supplemental instruction would have been unlikely to change the outcome at trial.[4] Davis maintains that the absence of a supplemental instruction allowed the prosecution to characterize the incident as "two separate and distinct episodes of rape" as the video-recorded interview included the victim's statements that Davis raped her at the front door and in the bedroom. But this argument overlooks Nurse Callahan's testimony in which she relayed the victim's report that also described the rape as occurring at the front door and in the bedroom. In other words, the trial record would have supported the prosecution's reference to two episodes of rape even with a supplemental instruction on the forensic interview.

_____

[4] Like the State court, this court assumes that trial counsel performed deficiently by failing to request a supplemental instruction. However, as detailed below, the court finds no other instances of trial counsel error, rendering a cumulative error analysis unnecessary. *See Malone v. Walls*, 538 F.3d 744 (7th Cir. 2008) ("[P]rejudice may be based on the cumulative effect of multiple errors. Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient.").

For similar reasons, the court cannot find that the trial court's admission of the video-recorded interview itself entitles Davis to habeas relief. To start, it is not clear that the trial court erred by admitting the forensic interview given that no objection was raised and given that trial counsel sought its admission for purposes of impeachment. *See* Ind. R. Evid. 613(b) ("Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires."). Even if the admission amounted to trial court error, the court cannot find that "the error must have produced a significant likelihood that an innocent person has been convicted." *See Howard v. O'Sullivan*, 185 F.3d 721, 724 (7th Cir. 1999). As detailed above, the victim's testimony on the issue of force was reasonably compelling and corroborated by multiple witnesses, and the prosecution also presented evidence of the bathroom incident through Nurse Callahan. By contrast, no other evidence corroborated Davis' testimony that he did not use force to compel sexual intercourse with the victim or that the victim consented to sexual intercourse. Therefore, these claims are not a basis for habeas relief.

<u>Failure to Impeach with Prior Inconsistent Statements</u>

Davis asserts that he is entitled to habeas relief because trial counsel erred by failing to impeach the victim with prior inconsistent statements. Specifically, he argues that trial counsel should have presented the probable cause affidavit, which indicated that the victim reported that Davis had pushed her against a bedroom door to impeach the victim's testimony that Davis pushed her against the front door. He argues that trial

19

counsel should have presented the report from the Department of Child Services, which indicated that the victim reported that Davis penetrated her at the front door for twenty minutes without a condom and that she did not shower at Thompson's house, to impeach her testimony that omitted any reference to Davis penetrating her without a condom and that she did shower at Thompson's house.

On September 6, 2019, Detective Myles signed a probable cause affidavit indicating that the prosecution had sufficient evidence to charge Davis with rape and sexual battery. ECF 12-9 at 126-27. The probable cause affidavit included the contents of the victim's interviews with Officer Eash, Nurse Callahan, and Lorrie Freiburger. *Id.* The post-conviction record contains a portion of a Department of Child Services report, which includes the contents of the forensic interview with Lorrie Frieburger. The report reads, " [The victim] reported when she got inside of her friend's house, she wanted to shower but her friend told her not to and to go home and tell her mom." *Id.* at 149. However, according to the video recording of the forensic interview, the victim reported, "[Wimes] brought me these clothes so I could change out of [Thompson's] clothes because he let me get in the shower. He was like, 'Don't you wanna wash that off of you?' And I was like yeah." State's Ex. 7 at 1:00:15-23.

At trial, trial counsel cross-examined the victim as follows:

**Trial Counsel:** How long you say that lasted?

**Victim:** Five minutes tops maybe.

**Trial Counsel:** There at the door?

**Victim:** Yes, sir.

**Trial Counsel:** Did you ever go to the bed after that?

**Victim:** No, sir.

**Trial Counsel:** Did you ever tell anybody involved in this case that you went to the bed?

**Victim:** No, sir, not that I remember.

**Trial Counsel:** You don't recall telling Officer Eash that [Davis] threw you on his bed?

**Victim:** No, sir.

**Trial Counsel:** Do you recall Officer Eash coming to talk to you at the hospital?

**Victim:** I remember somebody coming to talk to me, I just don't remember who.

**Trial Counsel:** You don't remember telling that person that Marvin threw you on the bed and that you fought and he held you down on the bed?

**Victim:** No, sir.

**Trial Counsel:** So if Officer Eash wrote that in his report, is that all a lie?

**Victim:** I wouldn't say it's a lie. I just don't remember telling him that.

**Trial Counsel:** What about to Ms. Lorrie Freiburger at the [child advocacy center], do you recall speaking with her?

**Victim:** Yes.

**Trial Counsel:** Do you recall telling her that he grabbed your arm and led you into his bedroom and you guess that's when he put on a condom?

**Victim:** No, sir.

**Trial Counsel:** So again, if that was in her report, would she be lying?

**Victim:** I've been trying to forget this since it happened. I don't remember some stuff.

**Trial Counsel:** So you don't remember saying any of that. Do you remember any of that happening?

**Victim:** I just remember the door.

**Trial Counsel:** Do you remember speaking with Detective Myles?

**Victim:** Yes.

**Trial Counsel:** Do you remember telling him or isn't it true that you told him [Davis] took your arms and you went into the bedroom and he put you on his bed?

**Victim:** I do not remember making that statement at all.

**Trial Counsel:** Okay. Do you remember that happening?

**Victim:** No.

**Trial Counsel:** Do you remember telling him that that's when he put on a condom and you guys had sex in his bed?

**Victim:** No, sir.

* * *

**Trial Counsel:** After you exited the bathroom, did you sit on the couch?

**Victim:** After I exited the bathroom, I was just standing there. I just wanted to leave. I came up with a lie and said my grandfather needed me.

**Trial Counsel:** So you were not sitting on the couch?

**Victim:** No, sir.

**Trial Counsel:** And you were not sitting on a couch and texting a friend at that point?

**Victim:** No, sir. I was still standing.

22

**Trial Counsel:** It is true that you attended a deposition on February 22, 2019, at 2:24 p.m. at the prosecutor's office here, correct?

**Victim:** Yes, sir.

**Trial Counsel:** And at that time, you gave a sworn statement, much like you did this afternoon before you started testifying?

**Victim:** Yes, sir.

**Trial Counsel:** And isn't it true that you stated that you walked into the living room and sat down, took out your phone, and started texting Jameslynn?

**Victim:** I could have sworn I was still standing. I don't remember sitting down.

**Trial Counsel:** So today, looking back to July 18, 2018, you don't remember sitting down, correct?

**Victim:** Yeah. I was still standing.

**Trial Counsel:** So at that time when you gave this statement under oath, was that a lie?

**Victim:** Like I said before, I've been trying to forget this since it happened.

**Trial Counsel:** I just ask you to answer the question, please.

**Victim:** No, sir, it was not a lie.

* * *

**Trial Counsel:** You recall going to the sexual assault treatment center?

**Victim:** Yes, sir.

**Trial Counsel:** Do you recall telling her that you went into the bedroom with [Davis] and laid down on the bed?

**Victim:** No, sir.

23

**Trial Counsel:** And I know your testimony today is you never once went into the bedroom, correct?

**Victim:** Yes, sir.

ECF 12-5 at 161-71.

Trial counsel also cross-examined Officer Eash:

**Trial Counsel:** You are trained to write true and accurate reports, correct?

**Officer Eash:** I am, sir.

**Trial Counsel:** And you did that in this case?

**Officer Eash:** I did, sir.

**Trial Counsel:** And you, obviously, went to the hospital and you spoke with [the victim]?

**Officer Eash:** I did, sir.

**Trial Counsel:** And she told you what happened?

**Officer Eash:** She did, sir.

**Trial Counsel:** Isn't it true that she mentioned at one point that Mr. Davis threw her on the bed?

**Officer Eash:** She did.

**Trial Counsel:** And that while on the bed, she fought him?

**Officer Eash:** She did.

**Trial Counsel:** And that was after he, apparently, held her against her bedroom door?

**Officer Eash:** Yes.

ECF 12-6 at 18-20.

At closing, trial counsel argued as follows:

24

You heard that, at the emergency room, [the victim] spoke with Officer Eash, CAC, Lorrie Freiburger, sexual assault trauma center, Shawn Callahan, Detective Myles. Yet on Tuesday, when [the victim] got up here alone all she told you about that day was that [Davis] had sex with her at that doorway, that's the only thing she testified about, from behind and she was standing up, okay?

                                                        \* \* \*

Did he have a condom on at that time? Depends on which version you are following. Because yesterday, when you watched the [forensic interview], she said he put the condom on when they were in the bedroom and she was laying on the bed. Nothing about that on Tuesday, nothing. After she had sworn to the judge that she would tell you all the truth and nothing but the truth, she said they were never in the bedroom, nope. And, in fact, when I asked her about that, she did not look happy. She was pissed off I asked her about that bedroom. And again, you can judge her demeanor when she testified in order to determine her credibility. She wanted to distance her story from that bedroom as much as she could when she presented it to all of you. Why do you think that is? Because that's where they really had sex, consensual sex, in that bedroom. Or another explanation is that maybe she doesn't even remember saying that she was in the bedroom to anybody. It's tough to keep a lie going for so long, to remember what version you have to stick to. Never talked about a bedroom in her deposition, against sworn testimony.

ECF 12-6 at 231-37.

At the post-conviction stage, Davis argued that trial counsel rendered ineffective assistance by failing to present the probable cause affidavit and the Department of Child Services report. ECF 11-8 at 20-22. He contended that the doctrine of completeness allowed the admission of this evidence because they contained statements that were inconsistent with the victim's testimony. *Id.* Under Indiana law, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require at that time the introduction of any other part or any other writing or recorded statement which in fairness ought to be considered contemporaneously with

it." Ind. Evid. R. 106. "According to the doctrine of completeness, a party may place into evidence the remainder of a statement or document which the opposing party has introduced when the portions relied upon by the opposing party may be misleading to the jury when taken out of context." *Norton v. State*, 772 N.E.2d 1028, 1033 (Ind. Ct. App. 2002). "The doctrine is designed to avoid misleading impressions caused by taking a statement out of its proper context or otherwise conveying a distorted picture by the introduction of only selective parts of the document." *Barnett v. State*, 916 N.E.2d 280, 286 (Ind. Ct. App. 2009).

The Indiana Court of Appeals construed the argument as an argument that "trial counsel was ineffective for allowing the State to introduce into evidence a redacted portion of the probable-cause affidavit and DCS report and not asking the trial court to admit the rest of the documents under the doctrine of completeness." ECF 11-11 at 11. The appellate court indicated that, when one party presented a portion of a conversation or document, the doctrine of completeness allowed an opposing party to present the entire conversation or document. *Id.* The appellate court rejected the claim, reasoning that neither party introduced the probable cause affidavit or the DCS report. *Id.*

After reviewing the record, the court cannot find that the State court rendered an unreasonable decision on this claim. Though this court parses the claim in a slightly different manner than the State court, the end result remains the same. The prosecution did not elicit the contents of the victim's conversation with Officer Eash. They did not present any portion of the probable cause affidavit or the Department of Child Services

report. While the Department of Child Services report memorialized portions of the forensic interview, the prosecution presented the forensic interview in its entirety via video recording. Consequently, trial counsel would not have been able to present the probable cause affidavit or the Department of Child Services report under the doctrine of completeness.

      In the habeas petition, Davis similarly but more broadly argues that trial counsel was ineffective for failing to impeach by presenting the probable cause affidavit or the Department of Child Services report. Trial counsel did not present the probable cause affidavit or the Department of Child Service report to impeach the victim, but he performed the functional equivalent. For example, he capably highlighted the inconsistencies between the victim's testimony and her report to Officer Eash through cross-examination of the victim and Officer Eash. Trial counsel also allowed the prosecution to present in its entirety the forensic interview from which the probable cause affidavit and the Department of Child Services report was derived. Trial counsel further emphasized the inconsistences between the victim's trial testimony and her initial reports at closing. Moreover, presenting the probable cause affidavit and the Department of Child Services report in their entirety posed a reasonable possibility of prejudicing Davis as substantial portions of those documents indicate that he raped the victim as charged.

      On this basis, the court cannot find that trial counsel performed deficiently or prejudiced Davis' case by declining to present the probable cause affidavit and the

Department of Child Services report at trial. Therefore, this ineffective assistance of trial counsel claim is not a basis for habeas relief.

Prosecutorial Misconduct

Davis asserts that he was entitled to habeas relief because the prosecution made an improper reference to "two separate and distinct episodes of rape" during closing argument and that trial counsel erred by failing to object to the improper closing argument. He maintains that this reference was inconsistent with the victim's testimony and that it relied on the video-recorded interview, which the prosecution knew to be false.

"In evaluating a claim of prosecutorial misconduct as a violation of the petitioner's due process right to a fair trial, the inquiry is whether the prosecutor's closing argument statements so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Shepard v. Lane*, 818 F.2d 615, 621 (7th Cir. 1987). The relevant factors include: "1) whether the prosecutors' statements manipulated or misstated the evidence; 2) whether the statements implicated specific Bill of Rights provisions such as the right to counsel or the right to remain silent; 3) whether the improper statements were an invited response to the argument of defense counsel; 4) whether the trial court instructed the jury to disregard the improper statements; 5) whether the defense had and used the opportunity for rebuttal to counter the prosecutors' statements; and 6) the weight of the evidence against the defendant." *Id.* "If the improper statements do not specifically implicate constitutional rights, a

28

habeas petitioner must demonstrate that the outcome of the trial would have been different." *Id.* at 622.

"The Supreme Court has clearly established that a prosecutor's knowing use of perjured testimony violates the Due Process Clause." *Schaff v. Snyder*, 190 F.3d 513, 530 (7th Cir. 1999). "When the defendant argues that the government allegedly used perjured testimony, to warrant setting the verdict aside and ordering a new trial, the defendant must establish that: (1) the prosecution's case included perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Shasteen v. Saver*, 252 F.3d 929, 933 (7th Cir. 2001). Perjury is "the act or an instance of a person's deliberately making material false or misleading statements while under oath." BLACK'S LAW DICTIONARY.

Davis did not object to the closing argument at trial or raise the issue on direct appeal. At the post-conviction stage, Davis argued that that trial counsel erred by failing to object to the improper closing argument. ECF 11-8 at 25-27. The Indiana Court of Appeals rejected the ineffective assistance claim, noting that the record contained substantive evidence of that the rape occurred both at the front door and in the bedroom. ECF 11-11 at 11-12. The appellate court further noted the forensic interviewer's testimony that it is not uncommon for sexual assault victims to remember the initial portion of the encounter better than subsequent portions. *Id.* The appellate court concluded that trial counsel was not ineffective for failing to object. *Id.*

29

After reviewing the record, the court cannot find that the State court rendered an unreasonable determination on the ineffective assistance of trial counsel claim. As noted by the Indiana Court of Appeals, the record contained both the videotaped interview and Nurse Callahan's testimony to support the argument that two separate episodes of rape occurred at the front door and in the bedroom. The reference to two separate episodes of rape thus does not amount to a misstatement of the evidence.

Davis characterizes this evidence as false because it contrasts with the victim's testimony at trial in which she denied that the rape occurred in the bedroom. As an initial matter, Davis has not adequately demonstrated that the victim's statements in her initial reports were false. To Davis' point, it stands to reason that the rape either did or did not occur in the bedroom, so one of the victim's accounts must necessarily be false, whether intentionally or inadvertently. However, it seems more likely that the victim's testimony at trial was false given that more than a year had passed since her initial reports by the time she testified at trial. At trial, the victim explained these inconsistencies by testifying that she had been trying to forget the incident since the time it occurred. Under these circumstances, it would not be unreasonable to infer that the passage of time and the victim's reluctance to dwell on the traumatic incident affected her ability to remember its details. Moreover, the prosecution's closing argument acknowledged the victim's omission of the bedroom incident at trial was a mistake by stating that "she [forgot] the bedroom incident." ECF 12-6 at 229.

Though Davis observes that the victim similarly omitted the bedroom incident at her deposition, the deposition also took place a substantial amount of time after the

incident – six months. By contrast, there is no apparent explanation as to why the victim would have falsely represented that the rape occurred in the bedroom in her initial reports. In any event, the operative test is whether the prosecution knowingly used perjured testimony. The record contains no evidence to suggest that the victim deliberately made misstatements in her initial reports or at trial or that the prosecution had knowledge that the victim made any such deliberate misstatements.

Consequently, Davis has not demonstrated that prosecutorial misconduct occurred during closing arguments or that trial counsel rendered ineffective assistance by failing to object to the closing arguments. Therefore, these claims are not a basis for habeas relief.

<u>PENDING MOTIONS</u>

Davis filed a motion for an evidentiary hearing. ECF 18. "If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted." Rule 8(a) of the Rules Governing Section 2254 Cases. "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*

Davis argues that an evidentiary hearing is necessary because "factual disputes regarding the ineffectiveness of trial counsel were not resolved in a State hearing." Notably, Davis does not specifically identify any such unresolved factual disputes. Further, the court has fully considered the habeas claims and reviewed the State court record but similarly cannot identify any material, unresolved factual disputes. Davis may be alluding to the victim's credibility or the issue of whether he compelled sexual intercourse from her by force, but the jury resolved these factual disputes in rendering their verdict. Davis also maintains that an evidentiary hearing is necessary to present the video-recorded forensic interview, the victim's deposition, the victim's criminal history, the probable cause affidavit, the Department of Child Services report, and trial counsel's affidavit. However, the State court record includes each of these documents and recordings, and this court has reviewed them all. Given the absence of material, unresolved factual disputes, the court denies the motion for an evidentiary hearing.

Additionally, Davis filed a motion to appoint counsel. ECF 19. The Criminal Justice Act, 18 U.S.C. § 3006A(a)(2)(B), permits the appointment of counsel in a habeas corpus case, if "given the difficulty of the case and the litigant's ability, [he] could not obtain justice without an attorney, he could not obtain a lawyer on his own, and he would have . . . a reasonable chance of winning with a lawyer at his side." *Winsett v. Washington*, 130 F.3d 269, 281 (7th Cir. 1997).

Davis represents that he has diligently attempted to secure counsel but offers no description of these efforts. He further maintains that this habeas case is beyond his ability, but his filings demonstrate his ability to form cogent arguments, to cite relevant

law and evidence, and to respond appropriately to court orders. Moreover, the court does not perceive that assistance of appointed counsel would have resulted in a different outcome in this habeas case. The court found the claims deficient on their merits after thorough consideration and review of the record rather than due to poor presentation in the petition and in the traverse. Therefore, the motion for appointed counsel is denied.[5]

CERTIFICATE OF APPEALABILITY

Pursuant to Section 2254 Habeas Corpus Rule 11, the court must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For the reasons explained in this order, there is no basis for encouraging Davis to proceed further.

For these reasons, the court DENIES the motion for counsel (ECF 19); DENIES the motion for an evidentiary hearing (ECF 18); DENIES the motion for status conference (ECF 23); DENIES the habeas corpus petition (ECF 1); DENIES a certificate

---

[5] Davis has also filed a motion requesting a status conference. ECF 23. This motion simply repeats his requests for an evidentiary hearing and appointed counsel. Because those requests are both denied, so too is his request for a status conference.

of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and DIRECTS the

clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on March 12, 2024.

 s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT